**In re McCRARY.**

[Cite as *In re McCrary* (1991), 75 Ohio App.3d 601.]

Court of Appeals of Ohio,
Madison County.

No. CA90–09–021.

Decided Aug. 19, 1991.

*R. David Picken,* Madison County Prosecuting Attorney, and *Stephen J. Pronai,* for appellee, Madison County Department of Human Services.

*Tanner & Mathewson* and *Shirley C. Hansgen,* for appellant, Carmen McCrary.

*Stephen P. Beathard,* guardian ad litem.

WALSH, Judge.

Appellant, Carmen McCrary, appeals a Madison County Court of Common Pleas, Juvenile Division, decision awarding permanent custody of her child to the Madison County Department of Human Services, Children's Services Division, and divesting her of all parental rights.

While living at home with her parents, Carmen, age fifteen, gave birth to Tim McCrary on March 4, 1987. Following a dispute with her parents in September 1988, Carmen vacated the residence and left Tim, who was sick at the time, with a friend. Carmen's failure to pick up Tim for several days

prompted appellee, Madison County Department of Human Services ("MCHS"), to file a dependency complaint on September 16, 1988. That same day, a complaint alleging Carmen to be a delinquent child per R.C. 2151.02 was filed by her mother.

At a hearing held on October 25, 1988, Carmen admitted the allegations of the dependency complaint. Based on her admission and other evidence presented, the court declared Tim dependent and awarded temporary custody to Madison County Department of Children's Services ("MCCS"). A case plan filed February 8, 1989 sought to strengthen Carmen's parenting skills and secure a home for Tim and herself.

Between September 1988 and March 1989, Tim underwent five placement changes. By March 1989, however, Carmen and Tim were residing together in the same foster home. Nevertheless, due to Carmen's status as a minor residing in foster placement, the court extended MCCS's temporary custody an additional six months on April 27, 1989. Despite its decision, the court noted that Carmen was making good progress in preparing herself for independent living.

Due to an apparent reconciliation between Carmen and her mother, the court found that Carmen had completely complied with the case plan and terminated MCCS's temporary custody on October 16, 1989.[1] Tim was placed with Carmen within a week and based on an apparent agreement between Carmen and her mother, the child remained with Carmen's mother. After subsequently learning that one of Tim's foster parents was baby-sitting the child, Carmen picked up Tim at the foster parent's home on November 13, 1989. Carmen returned the child to the foster home three days later, and Tim remained with his foster mother until November 22, 1989, when Carmen's mother took him home for Thanksgiving. After Carmen returned the child on November 27, 1989, the foster mother did not hear from Carmen until December 21, 1989.[2] On that date, Carmen attempted to obtain Tim, but based on instructions from Tim's caseworker, the foster parent refused to relinquish the child.

---

1. Although both parties agree that temporary custody terminated on this date, no journal entry regarding the termination appears in the record. Attached as an exhibit to Carmen's brief, however, is an October 31, 1989 judgment entry styled "In re Carmen McCrary," which terminates MCCS's temporary custody. From this entry, we will assume the validity of this date.

2. Although the court terminated MCCS's temporary custody on October 16, 1989, the agency quite mysteriously and without explanation filed a motion to terminate its temporary custody on November 28, 1989.

Sometime in December 1989, a new dependency complaint was filed, which the parties agreed to dismiss in order to proceed under the old complaint.[3] The court found little compliance with the case plan and on January 17, 1990 continued MCCS's temporary custody until March 16, 1990. A new case plan was filed, which set new objectives for Carmen, including finding employment and obtaining appropriate housing.

In response to MCCS's second motion to extend temporary custody, the court conducted a hearing on March 5, 1990, which Carmen failed to attend. The court found that despite MCCS's attempt to assist Carmen, she had visited her son twice since the last hearing and had not complied with the case plan. As a consequence, the court extended temporary custody to MCCS until September 16, 1990.

On June 7, 1990, MCCS moved for permanent custody of Tim. In an attempt to investigate Carmen's compliance with the case plan, the court continued the permanent custody hearing until August 23, 1990. In an entry dated August 31, 1990, the court permanently committed Tim to MCCS and ordered Carmen divested of her parental rights.

Carmen appealed in a timely manner and submits the following assignments of error for review:

Assignment of Error No. 1:

"The trial court erred in finding, by clear and convincing evidence, that an award of permanent custody was in the best interests of the child."

Assignment of Error No. 2:

"The court erred in finding that Tim McCrary could not be placed with his mother within a reasonable time."

Assignment of Error No. 3:

"The court lacked jurisdiction to hear the permanent custody motion on August 23, 1990 because the temporary custody terminated by operation of law on January 1, 1990."

Assignment of Error No. 4:

"Ohio Revised Code Section 2151.353 and 2151.415 are unconstitutional as applied to minor parents because they deprive them of due process of law, under both the Ohio Constitution and the United States Constitution."

Carmen's first assignment of error contends that the trial court's finding that it was in Tim's best interest to grant permanent custody to MCCS is not supported by clear and convincing evidence. She bases this contention on the

---

**3.** Again, the record failed to contain the new dependency complaint.

belief that MCCS failed to present evidence concerning Tim's relationship with his foster parents or that adoption would benefit the child.

■ In order to grant a motion for permanent custody, the trial court must initially find, by clear and convincing evidence, that the best interest of the child requires a transfer of custody to the appropriate agency. *In re Vickers Children* (1983), 14 Ohio App.3d 201, 203, 14 OBR 228, 230, 470 N.E.2d 438, 441; R.C. 2151.414(B). In making this determination, R.C. 2151.414(D) requires the trial court to consider the following nonexhaustive factors:

1. the reasonable probability of the child being adopted and whether a grant of permanent custody would facilitate an adoption;

2. the interaction and interrelationship of this child with his parents and foster parents;

3. the wishes of the child;

4. the custodial history of the child; and

5. the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. *In re Winkle* (Oct. 1, 1990), Butler App. No. CA89–11–165, unreported, at 6–7, 1990 WL 145723.

■ A review of the evidence adduced at the hearing indicates that clear and convincing evidence supports the court's finding that it was in the child's best interest to award permanent custody to MCCS. To begin, an MCCS supervisor testified that a probability existed that Tim could be adopted should MCCS obtain permanent custody of the child. The testimony of Tim's foster mother that she would adopt the child verifies this claim.

Furthermore, the supervisor also stated that such a placement would positively benefit Tim in that a permanent custody order would facilitate an adoption which would eventually provide the child with a permanent home. Finally, the supervisor acknowledged that a legally secured permanent placement would be in Tim's best interest.

The supervisor's testimony makes it evident that a reasonable probability existed that Tim would be adopted and that a permanent custody order would facilitate that adoption. Given her testimony and Tim's prior placement history, we find that the trial court's finding was supported by clear and convincing evidence. Thus, no merit is found in Carmen's first assignment of error.

■ In her second assignment of error, Carmen takes issue with the court's finding that Tim could not be placed with her within a reasonable time. R.C. 2151.414(B)(1) permits the court to grant permanent custody to a children's

services agency if such is in the best interest of the child and "[t]he child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time * * *." To support a finding that a child cannot be placed within a reasonable time with either of his parents, R.C. 2151.414(E) requires the presence of at least one listed factor.

Although Carmen attacks the court's ruling regarding the presence of the factors specified in both R.C. 2151.414(E)(1) and (4), we will address only that portion of her argument concerning the latter factor. Such an analysis is appropriate since the existence of only one factor is needed to justify the court's decision. R.C. 2151.414(E).

In pertinent part, R.C. 2151.414(E)(4) states that an entry finding that a child cannot be placed with either parent within a reasonable time shall be ordered if "[t]he parent has demonstrated a lack of commitment towards the child by failing to regularly support, visit, or communicate with the child when able to do so, or by actions showing an unwillingness to provide an adequate permanent home for the child." Evidence elicited at the August 23, 1990 hearing revealed that Carmen requested six visits with Tim over an eight-month period commencing January 19, 1990. According to Tim's caseworker, Carmen failed to show up for two of her scheduled visits. Of her four remaining visits, two lasted approximately one hour and one lasted three hours.

Despite Carmen's attempt to distinguish regular visitation and frequent visitation, clear and convincing evidence supports the conclusion that she demonstrated a lack of commitment towards her child. Her sporadic and irregular visits, which over an eight-month period totalled one weekend and four hours, indicate a lax and cavalier attitude on her part to regain custody of her child. Tim's caseworker concluded that Carmen's behavior demonstrated a lack of commitment to recover custody. On the basis of this evidence coupled with Carmen's unwillingness to provide a permanent home for Tim, we find that the trial court properly found that Tim could not be placed with Carmen within a reasonable time. Consequently, Carmen's second assignment of error is overruled.

The third assignment of error maintains that the trial court had no jurisdiction to conduct the August 23, 1990 permanent custody hearing since Section 7(C), Am.Sub.S.B. No. 89, 142 Ohio Laws, Part I, 198, 264, terminated MCCS's temporary custody order on January 1, 1990. According to that section, which applies to all children in the temporary custody of a public children's services agency and not in the custody of a parent, guardian or custodian as of January 1, 1989, (Section 9, *id.*) a public children's services agency's temporary custody order terminates on or before the earlier of January 1,

1990, or eighteen months after the last annual review. In this case, Carmen contends the order expired on January 1, 1990.

Carmen further argues that the filing of the new dependency complaint in December 1989 is insufficient to reinvoke jurisdiction, since the court decided to dismiss that complaint and proceed under the old case. As a result, Carmen maintains that the court's jurisdiction abated on January 1, 1990 and custody should revert to her.

■ Due to our duty to enforce the uncodified provisions of Am.Sub.S.B. No. 89 with the same vigor as a codified statutory provision, see *In re Sargent* (Aug. 15, 1990), Van Wert App. No. 15–89–13, 1990 WL 118087, unreported, we reluctantly agree with Carmen's position. As of January 1, 1989, Tim was in the temporary custody of MCCS and not in the custody of Carmen. Furthermore, the last recorded semiannual review was on September 11, 1989. Given the explicit language of Section 7(C), no alternative exists but to find that the temporary custody order expired on January 1, 1990.

MCCS, on the other hand, insists that the court properly retained jurisdiction over Tim pursuant to R.C. 2151.353(E)(1) and 2151.415(E). Yet the agency's failure to abide by the instructions contained in these statutes destroys any validity this claim may have. The third assignment of error is sustained.

■ In her fourth assignment of error, Carmen alleges that the time limits specified in R.C. 2151.353 and 2151.415 violate her constitutional rights to due process. Specifically, she argues that when the time periods in R.C. 2151.-415(A)(6), which allows for a six-month extension of temporary custody one year from the time specified in R.C. 2151.353(F), and in R.C. 2151.415(D)(2), which permits a second request for a six-month extension, are coupled with the rule in R.C. 2151.415(D)(4) that no more than two extensions may be granted, courts are not given any latitude in granting children's services agencies additional time to work with a parent. Since a minor parent often lacks the social and emotional maturity necessary to rear a child, the argument goes, the six-month to two-year time frame is an arbitrary time limit which amounts to a violation of a minor parent's due process rights.

In determining the constitutionality of the statutes in question, we are mindful of the notion that all legislative enactments enjoy a presumption of constitutional validity. *Schwan v. Riverside Methodist Hosp.* (1983), 6 Ohio St.3d 300, 6 OBR 361, 452 N.E.2d 1337. The party challenging the constitutionality of a statute bears the burden of overcoming this presumption. *State ex rel. Jackman v. Ct. of Common Pleas of Cuyahoga Cty.* (1967), 9 Ohio St.2d 159, 38 O.O.2d 404, 224 N.E.2d 906. As a result, "[a] legislative

enactment will be deemed valid on due process grounds ' * * * [1] if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary.' " *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 274, 28 OBR 346, 349, 503 N.E.2d 717, 720, quoting *Benjamin v. Columbus* (1957), 167 Ohio St. 103, 4 O.O.2d 113, 146 N.E.2d 854, paragraph five of the syllabus. However, a more rigorous test is operative when a fundamental right is implicated. *Holloway v. Brown* (1980), 62 Ohio St.2d 65, 16 O.O.3d 47, 403 N.E.2d 191. Accordingly, Carmen cites *Roe v. Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, for the proposition that where governmental action infringes upon such a fundamental right, a compelling state interest must justify the intrusion and the statute must be narrowly drawn to effectuate only that interest.

Both parties agree that the instant case implicates "the fundamental liberty interest of natural parents in the care, custody and management of their child." *Santosky v. Kramer* (1982), 455 U.S. 745, 753–754, 102 S.Ct. 1388, 1393–1394, 71 L.Ed.2d 599, 606–607. With respect to the state's right to protect the health and welfare of children, Carmen concedes that this interest "can become" compelling. In her case, however, she argues that her fundamental right to the custody of Tim outweighs the state's interest in permanency planning, given the arbitrariness of the six-month to two-year period.

A review of the case law in this area suggests that Carmen's argument fails to appreciate the importance of the state's interest in protecting the safety of children. Summarizing the state's role as *parens patriae*, the United States Supreme Court noted in *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652, that "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." The Ohio Supreme Court likewise recognized this principle in *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 13, 15 O.O.3d 3, 7, 399 N.E.2d 66, 70, when it held that "the state has a strong interest in terminating parental rights when it is in the child's best interest."

Noting that situations exist where society has an obligation to act for the protection of a child and society, one Ohio court wrote that "[t]he state possesses supreme power over the welfare of its children and has the power to limit the parents' rights in order to see to it that the child receives the care, protection or help he needs." *In re Zerick* (J.C.1955), 74 Ohio Law Abs. 525, 529, 57 O.O. 331, 333, 129 N.E.2d 661, 665. Finally, the resolution of the conflict between these two competing fundamental rights was explained by the supreme court in *In re Cunningham* (1979), 59 Ohio St.2d 100, 106, 13 O.O.3d 78, 81, 391 N.E.2d 1034, 1038, citing *In re R.J.C.* (Fla.App.1974), 300 So.2d 54, 58, when it stated, "it is plain that the natural rights of a parent are

not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed."

While Carmen is correct in asserting that she has a fundamental right to rear Tim, the fact that she is a minor does not render that right absolute. As the case law necessarily points out, a parent's interest in her child is at all times subject to the well-being of the child. Thus, where a parent, minor or otherwise, has repeatedly exhibited behavior which adversely affects her children, such as Carmen's inability to secure a permanent home for Tim, the parent's right to those children is properly subordinated.

Carmen's claim that her right to rear Tim overrides the state's interest further understates the importance of the goals embodied by the statutes. The paramount concern of both R.C. 2151.353 and 2151.415 is to preserve the well-being of children. Laws such as these which govern juveniles "were passed to conserve and protect the child life in our state." *State v. Miclau* (1957), 104 Ohio App. 347, 353, 5 O.O.2d 36, 39, 140 N.E.2d 596, 600, citing *In re Konnecker* (1929), 30 Ohio App. 502, 510, 165 N.E. 850, 852. The attention accorded to protecting children is necessary, the Supreme Court stated in *Prince, supra,* 321 U.S. at 168, 64 S.Ct. at 443, 88 L.Ed. at 653, since "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens * * *." Given these legitimate concerns, we find the state's interest compelling.

We also find the time provisions contained in both R.C. 2151.353 and 2151.415 to be narrowly drawn to effectuate that interest. Cf. *In re Williams* (1982), 7 Ohio App.3d 324, 7 OBR 421, 455 N.E.2d 1027 (although contested on grounds of vagueness, R.C. 2151.353 held to be a "narrowly drawn" statute). Carmen submits that the time limits in the temporary custody extensions are arbitrary. Contrary to Carmen's apparent belief, a parent is not automatically entitled to these time extensions. Rather, these extensions are granted only when the court determines that a parent has complied with the case plan and reasonable potential for reunification exists. Where this evidence is lacking, proceedings to permanently terminate parental rights may be properly commenced. Since the court ultimately makes this determination in light of the controlling principle of the best interest of the child, the fundamental rights of the respective parties are kept in the proper perspective.

Viewed in this context, the six-month to two-year time span is tightly drawn to attain only the state's interest in protecting children. The future well-being of a child dictates that the child not wait any longer than necessary for its mother or father to assume his or her rightful responsibilities. In Carmen's case, the time period was more than adequate, given that MCCS assisted her

in her effort to secure a stable home for almost two years. Despite this support, Carmen repeatedly failed to remedy her condition.

As an alternative to the current system devised by the General Assembly, Carmen suggests that the time provisions contained in both statutes begin to operate when a parent reaches eighteen. In our view, the adoption of such a plan would place a herculean burden on the already overcrowded juvenile court system and overworked children's services agencies. Taken to its logical conclusion, Carmen's suggestion would permit the state to assume custody of a minor parent's infant for up to a four- or five-year period. To allow a child at such a developmentally critical stage of its life to languish in a state of temporary custodianship for that length of time is simply unacceptable. Moreover, any change to a statutory provision is the province of the state legislature, and not this court.

Based on the aforementioned, Carmen has failed to overcome the strong presumption of constitutionality accorded to R.C. 2151.353 and 2151.415. Under the facts of this case, the application of the time frames specified in both statutes did not amount to a violation of Carmen's due process rights. "To find otherwise would be to invite the destruction of a system which, on the whole, has functioned well and to propel this court into a field beyond its jurisdiction." *State v. Clevenger* (1969), 19 Ohio App.2d 306, 308, 48 O.O.2d 416, 417, 251 N.E.2d 159, 161. Accordingly, we overrule Carmen's fourth assignment of error.

*Judgment reversed.*

WILLIAM W. YOUNG, J., concurs.

JONES, P.J., concurs separately.

JONES, Presiding Judge, concurring separately.

I concur in the reversal, but would also find the second assignment of error well taken. The reunification plan adopted by MCCS was unrealistic for a seventeen-year-old child mother with appellant's family background, education and physical problems. It was unreasonable to expect her to get a job, find suitable housing, and be able to support her child within the few months allocated by the plan, particularly when there was little or no help offered by MCCS. She should have been assisted and given additional time. This is demonstrated by the fact that she had indeed found housing and employment, with a safe haven for her child, by the date of the final hearing. Unfortunately, she had incurred the wrath of MCCS's personnel when she removed her child from the foster home. The specter of an overly zealous MCCS is haunting, particularly in instances where a young mother is determined to

keep her child in the face of adversity. There simply was insufficient evidence of a clear and convincing nature that the child could not have been placed with his mother within a reasonable period of time.